UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| FIDELITAD, INC.,<br><br>                Plaintiff,<br><br>   v.<br><br>INSITU, INC.,<br><br>                Defendant. | NO: 13-CV-3128-TOR<br><br>ORDER DENYING PLAINTIFF'S MOTION TO REMAND |

BEFORE THE COURT is Plaintiff's Motion to Remand (ECF No. 6). This matter was heard with oral argument on February 19, 2014. Mark G. Jackson appeared on behalf of the Plaintiff. Eric B. Wolff and Kate Reddy appeared on behalf of Defendant. The Court has reviewed the briefing and the record and files herein, and is fully informed.

## BACKGROUND

This is a breach of contract action. Plaintiff Fidelitad, Inc., ("Fidelitad") alleges that Defendant Insitu, Inc., ("Insitu") breached an exclusive distributorship

ORDER DENYING PLAINTIFF'S MOTION TO REMAND ~ 1

agreement for the sale of unmanned aerial vehicles manufactured by Insitu to military and government customers in Colombia. Fidelitad also asserts claims for misappropriation of trade secrets in violation of the Washington Uniform Trade Secrets Act ("UTSA"), RCW Chapter 19.108, breach of a proprietary information sharing agreement, breach of the implied duty of good faith and fair dealing, and unjust enrichment.

Fidelitad originally filed its Complaint in Klickitat County Superior Court. Insitu timely removed the case to this Court pursuant to 28 U.S.C. § 1442(a)(1), the federal officer removal statute. Fidelitad now moves to remand.

## FACTS[1]

Fidelitad was formed in early 2010 by Eric Edsall and Alejandro Pita. Prior to forming the company, Mr. Edsall and Mr. Pita were employed by Insitu as the head of international business development and head of program management, respectively. In these roles, Mr. Edsall and Mr. Pita were responsible for driving

---

[1] The following facts are drawn from Fidelitad's Complaint and are accepted as true for purposes of the instant motion. *See Jamison v. Purdue Pharma Co.*, 251 F. Supp. 2d 1315, 1318 (S.D. Miss. 2003) ("When considering a motion to remand, the district court accepts as true all relevant allegations contained in the complaint and construes all factual ambiguities in favor of the plaintiff.").

sales of an unmanned aerial vehicle ("UAV") manufactured by Insitu known as the ScanEagle.

In late 2009, while still employed by Insitu, Mr. Edsall and Mr. Pita traveled to Colombia to meet with representatives of the Columbian Air Force. The purpose of this visit was to assist the Colombian Air Force with problems it had been experiencing with two ScanEagles that it had previously acquired through the U.S. government. While in the country, Mr. Edsall and Mr. Pita identified a number of new, non-military applications for the ScanEagle. These applications included, among others, monitoring oil pipelines located in remote areas.

Upon returning to the United States, Mr. Edsall and Mr. Pita met with several Insitu executives to discuss the new opportunities they had identified in Colombia. Insitu was generally supportive, but was hesitant to divert resources away from its core military-focused applications. Thus, Mr. Edsall and Mr. Pita proposed to form a new business, at their own risk and expense, to act as a value-added reseller ("VAR") of Insitu's products in Colombia. Insitu agreed, and Mr. Edsell and Mr. Pita left the company in early 2010 to form Fidelitad.

Shortly thereafter, Insitu entered into a distributorship agreement with Fidelitad which granted Fidelitad the exclusive right to sell Insitu products in Colombia. The parties also entered into a written Mutual Proprietary Information

ORDER DENYING PLAINTIFF'S MOTION TO REMAND ~ 3

Agreement ("PIA") specifying the purposes for which proprietary information exchanged between them could be used.

In the months that followed, Fidelitad developed several potential sales opportunities with customers in Columbia. Fidelitad kept Insitu apprised of its progress and gave several presentations outlining its business strategy. Eventually, Fidelitad closed several sales with customers in Colombia. Fidelitad placed orders with Insitu for the products sold.

Fidelitad alleges that Insitu then "intentionally and maliciously moved forward with a charade of 'legal review' and 'license requirements' to delay the shipment of products to Fidelitad." Pl.'s Compl., ECF No. 1-1, at ¶ 61. Specifically, Fidelitad contends that Insitu delayed processing of the sales under the guise of needing to perform a Risk/Benefit Analysis Memorandum ("RBAM") and other legal compliance reviews. Pl.'s Compl., ECF No. 1-1, at ¶¶ 64-65, 72. Fidelitad further alleges that Insitu refused to ship a ScanEagle and related equipment until it had received clarification from the U.S. Department of State about the scope of an export license granted to Fidelitad. Pl.'s Compl., ECF No. 1-1, at ¶¶ 78-81. In Fidelitad's estimation, the purpose of these delay tactics was to create tension between Fidelitad and its Colombian customers, thereby paving the way for Insitu to sell its products to the customers directly.

Fidelitad alleges that Insitu's deliberate delay in processing its orders caused its customers to cancel their sales contracts. According to Fidelitad, this resulted in a loss of several millions of dollars in sales revenue. Fidelitad further alleges that Insitu has since completed several millions of dollars' worth of sales to the same Colombian customers whom Fidelitad had previously cultivated.

Fidelitad filed the instant lawsuit in Klickitat County Superior Court on October 16, 2013. Fidelitad's complaint asserts state law causes of action for misappropriation, breach of the Proprietary Information Agreement, breach of the exclusive distributor agreement, breach of the implied duty of good faith and fair dealing, and unjust enrichment. Insitu removed the case to this Court on November 20, 2013, pursuant to 28 U.S.C. § 1442(a)(1), the so-called federal officer removal statute. ECF No. 1. Fidelitad thereafter filed the instant motion to remand, arguing that the requirements for federal officer removal have not been satisfied. ECF No. 6.

## DISCUSSION

The federal officer removal statute is set forth at 28 U.S.C. § 1442(a)(1). The statute allows for removal of any case filed in state court against:

> The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

28 U.S.C. § 1442(a)(1). A defendant removing a case under § 1442(a)(1) must demonstrate (1) an action under the direction or authority of a federal agency or officer; (2) a causal connection between that action and the plaintiff's claims; (3) the existence of a colorable federal defense; and (4) that it qualifies as a "person" within the meaning of the statute. *Jefferson Cnty. v. Acker*, 527 U.S. 423, 430-31 (1999); *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1251 (9th Cir. 2006). Unlike other federal removal statutes, § 1442(a) must be construed "broadly in favor of removal." *Durham*, 445 F.3d at 1252.

Insitu asserts that removal is proper under § 1442(a)(1) because Fidelitad "seeks to hold [it] liable in state court for acts it took to comply with specific instructions from a federal officer." ECF No. 1 at 2. Specifically, Insitu contends that all exports of the ScanEagle UAV are subject to strict federal regulation and must be individually approved by the U.S. Government. As relevant here, Insitu asserts that any delays in processing Fidelitad's orders was the result of its attempts to verify that the sales in question complied with the terms of two export licenses granted to Fidelitad by the Directorate of Defense Trade Controls ("DDTC") of the U.S. Department of State. Given that it was required by federal law to complete this verification process, Insitu argues, all elements for federal officer removal have been satisfied.

ORDER DENYING PLAINTIFF'S MOTION TO REMAND ~ 6

Fidelitad has moved to remand the case, arguing that Insitu has failed to satisfy the first three requirements for federal officer removal: action under the direction of a federal officer, a causal connection to the plaintiff's claims, and a colorable federal defense. It does not contest that Insitu is a "person" within the meaning of § 1442(a)(1). The Court will address each of these three contested requirements in turn.

**A. Action Under the Direction or Authority of a Federal Agency or Officer**

The Court finds that Insitu was "acting under" the direction of a federal officer within the meaning of § 1442(a)(1) when it allegedly delayed processing of Fidelitad's orders to ensure that the requested equipment conformed to Fidelitad's export licenses. As Insitu notes, the export licenses were specific to individual sales; they were not merely "reaffirmations and/or clarifications" of generally-applicable International Traffic in Arms Regulations ("ITAR"). ECF No. 6 at 14. Specifically, the licenses contained several highly-specific "provisos" upon which Fidelitad's authority to export ScanEagles to Colombia was expressly conditioned:

> 1. This license approval is for a replacement Scan Eagle Unmanned Aerial Vehicle (UAV) aircraft only. Any electro-optical sensors, cameras, radars/SAR, or ground support equipment MUST BE the subject of a separate license.
>
> *   *   *
>
> 3. U.S. Government (USG) data link algorithms, protocol standards, encryption capabilities, jam/anti-jam capabilities, frequency hopping or associated message formats MUST NOT be discussed, offered or

ORDER DENYING PLAINTIFF'S MOTION TO REMAND ~ 7

> released.  Data link transmission capability MUST NOT exceed 10.71 Mbits/sec (compressed or uncompressed).
>
> * * *
>
> The replacement Scan Eagle UAV MUST be the same version, with the same performance capabilities, as the Scan Eagle UAV already in use by the Colombian MoD.  This license is for the UAV only.  Associated operational equipment/devices (sensors, GPS, datalinks, radios) MUST be the subject of a separate license request identifying the proposed systems and capabilities.  Hardware, software and digital database capability improvements/upgrades MUST be the subject of a separate license request.

ECF No. 1-2, Ex. A at 6; Ex. B at 6.  These provisos are specific directives issued in response to Fidelitad's requests to export a specific defense article to a specific customer in a specific country.  They reflect "subjugation, guidance and control" rather than mere government regulation.  *See Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 152 (2007).  Thus, Insitu was "acting under" the direction of the DDTC when it attempted to verify that Fidelitad's orders complied with the DDTC's provisos.  *Id.*

Fidelitad argues in its reply brief that Insitu could not have been "acting under" the direction of a federal officer because the export licenses "were not even directed at Insitu." ECF No. 12 at 5 (emphasis omitted).  The Court respectfully disagrees.  While it is true that the export licenses were issued to Fidelitad rather than to Insitu, Insitu was equally responsible for ensuring that the terms of the licenses were not violated.  *See* 22 C.F.R. § 127.1(e) ("No person may knowingly

ORDER DENYING PLAINTIFF'S MOTION TO REMAND ~ 8

or willfully attempt, solicit, cause, or *aid*, *abet*, counsel, demand, induce, procure, or *permit* the commission of any act prohibited by, or the omission of any act required by 22 U.S.C. 2778, 22 U.S.C. 2779, or any regulation, license, approval, or order issued thereunder.") (emphasis added). Indeed, Insitu may have had a stronger obligation to ensure that the equipment conformed to the export licenses; as the manufacturer of the subject equipment, Insitu was in the better position to ensure that all technical specifications had been met. Accordingly, Insitu has satisfied the first requirement for federal officer removal.

### B. Causal Connection to the Plaintiff's Claims

To satisfy the second requirement for removal under § 1442(a)(1), Insitu must demonstrate "a causal nexus between its actions, taken pursuant to a federal officer's directions, and [Fidelitad's] claims." *Durham*, 445 F.3d at 1251. A causal connection between Insitu's actions and any one of Fidelitad's claims is sufficient. *See Nat'l Audubon Soc. v. Dep't of Water & Power of City of Los Angeles*, 496 F. Supp. 499, 509 (C.D. Cal. 1980) ("It is well settled that if one claim cognizable under Section 1442 is present, the entire action is removed, regardless of the relationship between the Section 1442 claim and the non-removable claims.").

Insitu has satisfied the causal nexus requirement.  Fidelitad has asserted a claim for breach of the implied duty of good faith and fair dealing implicit in its contracts with Insitu.  *See* Pl.'s Compl., ECF No. 1-1, at ¶¶ 137-141.  The crux of this claim is that Insitu breached its implied duty of good faith and fair dealing by deliberately delaying Fidelitad's orders under the pretext of ensuring that Fidelitad had complied with the terms of the export licenses.  Whether Insitu breached its duties of good faith and fair dealing will depend upon the extent to which Insitu deviated from (or complied with) its obligations under the export licenses and the ITAR.

Fidelitad argues that a causal nexus is lacking because the above claim does not arise from Insitu's purported efforts to ensure that Fidelitad complied with the provisos in the export licenses.  Specifically, Fidelitad maintains that its breach of good faith and fair dealing claim relies exclusively upon conduct which occurred *after* it had fully complied with Insitu's demands—*e.g.*, Insitu's alleged decision to usurp Fidelitad's sales opportunities in Colombia.  *See* ECF No. 6 at 17 ("Insitu's alleged efforts under ITAR were not a proximate consequence of Fidelitad's claims considering that Fidelitad ultimately complied with *each and every purported concern* raised by Insitu with respect to ITAR compliance.  Nevertheless, Insitu still ultimately refused to accept further orders from Fidelitad, choosing to exclude Fidelitad from ScanEagle sales in the Colombia market and taking the market for

itself.") (emphasis in original). In other words, Fidelitad contends that Insitu's delay in processing its orders under the pretext of ensuring compliance is not the subject of its breach of good faith and fair dealing claim.

The Court is not persuaded by this argument. Fidelitad's complaint broadly alleges that Insitu developed an elaborate scheme to usurp its sales opportunities in Colombia—and that delaying its orders under the pretext of ensuring compliance was a central component of Insitu's plan. For example, the complaint alleges:

> Upon realizing the extent of Fidelitad's work in Colombia and the lucrative market that Fidelitad had created and fostered, Insitu decided that it wanted the Colombia market for itself, without Fidelitad's involvement and without permitting Fidelitad to share in the success of this new market.
>
> Although Insitu had initially authorized and encouraged Fidelitad to create and develop the market in Colombia for the use and maintenance of Insitu [UAVs], Fidelitad had apparently become too successful in its ideas and implementation. As a result, Insitu sought to reap all of the benefits from this new market—and exclude Fidelitad entirely.
>
> As set forth below, Insitu intentionally and maliciously moved forward with a charade of "legal review" and "license requirements" to delay the shipment of products to Fidelitad.
>
> Such actions ultimately caused Fidelitad to miss contractually obligated delivery dates for delivery to [the Colombian customers], to cancel certain ScanEagle hardware deliveries under contract for delivery to [the customers] to renegotiate existing contracts with [the customers], damaged Fidelitad's goodwill with its customers, and allowed Insitu to deal directly with Fidelitad's customers themselves, resulting in direct sales by Insitu based on contract opportunities developed by Fidelitad pursuant to the Distributor Agreement and

1     disclosed by Fidelitad to Insitu under the terms and protections of the
2     PIA.

3 Pl.'s Compl., ECF No. 1-1, at ¶¶ 59-62.  These allegations are incorporated by

4 reference into Fidelitad's cause of action for breach of implied duty of good faith

5 and fair dealing.  Pl.'s Compl., ECF No. 1-1, at ¶ 137.

6     The only fair reading of these allegations is that the breach of good faith and

7 fair dealing claim is based—at least in part—on Insitu's delay in processing

8 Fidelitad's orders under the guise of ensuring regulatory compliance.  Accordingly,

9 the Court finds that a causal nexus has been sufficiently established.

### C. Colorable Federal Defense

    Insitu asserts that it has a colorable federal defense to Fidelitad's breach of good faith and fair dealing claim.  For the reasons discussed above, the Court agrees.  The degree to which Insitu conformed with its obligations under the export licenses and the ITAR is directly relevant to the issue of breach.  If Insitu can show that the delay in processing Fidelitad's orders was caused by its duties to comply with federal law, then it will be more difficult for Fidelitad to prove that Insitu breached its duties of good faith or fair dealing.  Conversely, if Fidelitad can demonstrate that Insitu used its duty to comply with federal law as a mere pretext for delaying the orders, then a finding of breach becomes much more likely.

1    Given that Insitu has satisfied all four requirements for federal officer

2 removal under § 1442(a)(1), Fidelitad's motion to remand is denied.

3 **IT IS HEREBY ORDERED:**

4    Plaintiff's Motion to Remand (ECF No. 6) is **DENIED**.

5    The District Court Executive is hereby directed to enter this Order and

6 provide copies to counsel.

7    **DATED** February 26, 2014.



THOMAS O. RICE
United States District Judge

ORDER DENYING PLAINTIFF'S MOTION TO REMAND ~ 13