1
2
3
4

5                    UNITED STATES DISTRICT COURT

6                    EASTERN DISTRICT OF WASHINGTON

7

8   FIDELITAD, INC.,                        NO:  13-CV-3128-TOR

                        Plaintiff,          ORDER GRANTING IN PART AND
9                                           DENYING IN PART DEFENDANT'S
        v.                                  MOTION FOR SUMMARY
10                                          JUDGMENT
    INSITU, INC.,
11
                        Defendant.
12  _____
    INSITU, INC.,
13
                Counter Claimant,
14
        v.
15
    FIDELITAD, INC.,
16
                Counter Defendant.
17  _____

18      BEFORE THE COURT are Defendant's Motion for Summary Judgment

19  (ECF No. 59), Plaintiff's Motion to Strike (ECF No. 75) and Plaintiff's Motion to

20  Quash Deposition Notices (ECF No. 76).  These matters were heard with

    ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S
    MOTION FOR SUMMARY JUDGMENT ~ 1

telephonic oral argument on February 23, 2016.  Kevin A. Rosenfield appeared on behalf of the Plaintiff.  Eric B. Wolff, Steve Y. Koh, Paul S. Graves, and Kate Reddy appeared on behalf of Defendant.  The Court has reviewed the briefing and the record and files herein, and heard from counsel, and is fully informed.

## BACKGROUND

This case concerns allegations of misappropriation of trade secrets and tortious conduct arising out of expected sales of unmanned aerial vehicle ("UAV") in Colombia, South America.

Plaintiff filed the instant lawsuit in Klickitat County Superior Court on October 16, 2013. ECF No. 1-1.  Defendant removed the case to this Court on November 20, 2013, pursuant to 28 U.S.C. § 1442(a)(1), the so-called federal officer removal statute.  ECF No. 1.

On August 7, 2014, Fidelitad filed their Second Amended Complaint alleging state law causes of action for (1) violation of the Washington Uniform Trade Secret Act (WUTSA), (2) breach of the Proprietary Information Agreement (PIA), (3) breach of the implied duty of good faith and fair dealing under the PIA, (4) unjust enrichment ("quasi-contractual in nature or a contract implied in law"), and (5) tortious interference with business expectancy.  ECF No. 37.  Insitu's answer alleged a counterclaim for breach of contract.  ECF No. 29.

On December 14, 2015, Insitu filed the instant motion seeking summary judgment on all claims against it, and seeking summary judgment in its favor for its claim.  ECF No. 59.  Fidelitad responded in opposition.  ECF No. 64.  Insitu replied.  ECF No. 77.

On January 22, 2016, Fidelitad filed a motion to strike the declarations of Insitu's witnesses Lt. Col. Gerstenecker and Col. Brown.  ECF No. 75.  Insitu responded in opposition, ECF No. 80, and Fidelitad replied.  ECF No. 85.

## FACTS[1]

Fidelitad was formed in early January 2010 by Eric Edsall and Alejandro Pita.  Mr. Edsall and Mr. Pita were employed by Insitu prior to forming Fidelitad and for a short time afterwards.  Mr. Pita joined Insitu in 2004 and was Insitu's Director, Business Development when he left in April 2010.  ECF No. 64-5 at ¶¶ 10-12.  Mr. Edsall joined Insitu in 2006 and prior to leaving in April 2010, was the Director of International Business Development. ECF No. 64-4 at ¶ 6.  In these

---

[1] The following facts are the undisputed material facts, unless otherwise noted.  For purposes of summary judgment, "the Court may assume that the facts as claimed by the moving party are admitted to exist without controversy except as and to the extent that such facts are controverted by the record set forth [in the non-moving party's opposing statement of facts]."  LR 56.1(d).

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT ~ 3

roles, Mr. Edsall and Mr. Pita were involved in Insitu's business development for the unmanned aerial system ("UAS")[2] known as the ScanEagle.

Insitu, a wholly owned subsidiary of Boeing since 2008, designs, manufactures, and sells the ScanEagle. ECF No. 64-1 at 1. The ScanEagle can provide live video surveillance and remain in flight over 24 hours. *Id.* It was designed to be operated without the use of a runway, and can be launched and retrieved from ship decks or undeveloped terrain. *Id.* The system was originally developed for the commercial tuna boat market. *Id.* The U.S. Navy began to use ScanEagle on board their ships for maritime surveillance and the system's use was expanded by the Marines in Iraq and Afghanistan. *Id.*

In 2006, before Boeing purchased Insitu, Boeing purchased ScanEagle systems, two of which the Colombian Air Force ("COLAF") received. *Id.* at 2. Thereafter, Insitu was contacted several times by either the Colombian military or the U.S. Military Group ("MILGP") regarding the use of ScanEagle systems in Colombia. For instance, in 2007, COLAF called Insitu seeking ScanEagle parts and support, and spoke to Mr. Pita, then an Insitu program manager, which is when Insitu first learned that Colombia had its ScanEagle systems. ECF No. 64-5 at ¶¶ 14-16, 18. Further, in April 2008, COLAF contacted Boeing's sales agent in

---

[2] Unmanned aerial systems are commonly known as drones.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT ~ 4

Colombia, ANCLA, regarding ScanEagles.  ECF Nos. 62-3 at 158.  Several months later, in October 2008, Insitu was informed by an employee of the State Department of an opportunity to use ScanEagles for coca eradication/counter-narcotics in Colombia.  ECF Nos. 64-5 at ¶ 63; 62-9.

In March 2009, Mr. Pita visited Colombia as an Insitu employee.  ECF Nos. 62-3 at 188; 62-10; 63-3.  He met with the COLAF and State Department employees and discussed opportunities for Insitu products and services in the Colombian market, including the use of ScanEagle systems for maritime and counter-narcotics surveillance, including coca fields.  ECF No. 63-3; 62-10.  Mr. Pita also acknowledged that by April 2009, the idea of using ScanEagles for pipeline surveillance was very well known.  ECF No. 62-3 at 192:7-11.

Additionally, in May 2009, PMA-263,[3] an Insitu client, gave a presentation to Insitu and COLAF in which it presented an anticipated 3-5 year plan, to include

---

[3] PMA-263 is the Navy and Marine Corps Small Tactical UAS Program Office, which facilitated Foreign Military Sales ("FMS") of ScanEagles to Colombia.  An FMS involves the U.S. government buying defense products and services and then providing or selling them to foreign countries or international organizations, as contrasted with commercial sales which do not directly involve the U.S. government.  *See* ECF No. 60 at 13 n.3.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 5

training, support equipment, spare parts, field service, upgrades, and more.[4]  ECF No. 64-1 at 33.  More correspondence and meetings were held from August to November 2009 between Insitu employees and potential customers.  ECF Nos. 62-3 at 220-221; 63-8.

In September 2009, while still employed by Insitu, Mr. Edsall and Mr. Pita traveled to Colombia to meet with representatives of the Columbian government and military.  ECF Nos. 62-3 at 67-69; 64-4 at ¶ 16.  While working for Insitu, Mr. Edsall and Mr. Pita identified a number of new, non-military applications for the ScanEagle.  *Id.*

On December 30, 2009, while still employed at Insitu, Mr. Pita received an email from COLAF informing him that it had the funding to pursue a direct commercial purchase for spare parts.  ECF No. 62-13.  Mr. Pita forwarded the email to Mr. Edsall who replied that "Insitu needs to allow Fidelitad to hold the procurement contract with the COLAF."  *Id.*

On January 7, 2010, Fidelitad was incorporated.  ECF Nos. 37 at ¶ 28; 29 at ¶ 28.  According to its principles, Fidelitad was formed for the purpose of acting as

---

[4] Fidelitad does not dispute that this presentation took place, but contends that "does not mean that PMA-263 actually expected such duration or support plan [be implemented]".  ECF No. 64-4 at ¶ 48.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 6

a value-added reseller of Insitu products in Colombia.  ECF No. 37 at ¶ 20.

Fidelitad rejected Insitu's suggestion that it serve as an international sales

consultant.  ECF No. 62-5 at 177-178.   Instead, as a valued-added reseller,

Fidelitad's business plan was to purchase ScanEagles systems, bundle it with

additional equipment and services, and resell them to end users.  ECF Nos. 37 at ¶

20; 64-4 at ¶ 34.  On January 8, 2010, Insitu's CEO Steve Sliwa informed Boeing

of his support for Fidelitad as a value added reseller of Insitu products in

Colombia.  ECF Nos. 37 at ¶ 26; 37-1.

    After Fidelitad's incorporation, the parties never entered into a formal

written contract governing their business relationship. ECF No. 62-5 at 158, 178

(Mr. Edsall testified that, "we were very clear" that Fidelitad was not going to be

an ISC (independent sales consultant), "we were going to be a value added

reseller.").  The parties also dispute whether Fidelitad was promised to serve as the

exclusive distributor of ScanEagles in Colombia.  At oral argument, Insitu argued

exclusivity was never promised and this was known because of the continuing

presence of Boeing's existing sales agent in Colombia, ANCLA, and because

Insitu still planned to conduct FMS cases with the Colombian military.  Fidelitad

countered that it was led to believe and orally promised it would have an exclusive

distributor deal.  *Id*.  In support, Fidelitad points to a February 10, 2010 letter

signed by Insitu's CEO addressed to ACOFA (the Colombian Air Force

purchasing agency) discussing an "exclusive arrangement with Fidelitad," ECF No. 65-7, and stating Fidelitad "is the exclusive direct authorized Distributor for Insitu products and services within the Territory of Colombia."  ECF No. 69-6. But in his deposition, Mr. Edsall explained the letter to be only what he thought was a requirement of the Colombians that Fidelitad be registered with the ACOFA office in Fort Lauderdale as indicative of an exclusive supplier for a particular product.  ECF No. 62-5 at 143-45, 153.  At his deposition, Mr. Edsall admitted that all the terms of an oral distributorship were never even negotiated.  *Id*. at 161.

By April 2010, Mr. Edsall and Mr. Pita officially left Insitu's employment. In the months that followed, Fidelitad entered into negotiations and executed four UAS contracts with the COLAF worth about $400,000 and three contracts with the MILGRP worth about $600,000.  ECF Nos. 64-4 at ¶ 69; 64-5 at ¶¶ 37-39.

However, Insitu ran into delays filling orders due to compliance issues with Boeing processes and export controls.  For instance, on December 9, 2010, Insitu's Compliance Officer, Brenda Jensen, sent Mr. Edsall a letter informing him of compliance issues with Fidelitad's export license to ship a ScanEagle electro-optical sensor on an ordered aircraft, and stated more information was needed in order to assure the sensor could be legally shipped and exported.  ECF No. 62-21. The letter requested Fidelitad either modify its license or provide a letter from the

State Department that the sensor could be shipped under the current license. *Id.* The letter also stated the aircraft, without the sensor, was released for delivery. *Id.*

Delays were also caused when Boeing determined that its Risk Benefit Analysis Memorandum ("RBAM")[5] process was required for Insitu's sales to Fidelitad for products to be used in Colombia. ECF No. 64-4 at ¶¶ 72, 76-77. Application of the process caused Fidelitad to be unable to timely fulfill its contractual obligations. *Id.*

Insitu claims these delays were not done in bad faith or maliciously. Insitu claims it was "cautious and conservative about export compliance" and its internal cost/benefit analysis was not done in bad faith, it was applied to many different customers and transactions. ECF Nos. 59 at 11-13; 60 at ¶¶ 55-61.

Fidelitad alleges that considerable evidence exists that Insitu applied the export controls and RBAM process maliciously and/or in bad faith. ECF No. 64-1 at 84-85. It ascribes this evidence to "Brenda Jensen, a former employee of Insitu, contends that Insitu applied the review process in an unprecedented fashion and

---

[5] The RBAM process is a standardized risk assessment tool designed to evaluate potential liability associated with sales of Boeing products. The process can take weeks or even months to complete, and if the liability risk is too high pending contracts are denied. ECF No. 60 at 28.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 9

1    with malicious intent.  *Id*. at 85 (citing to Jensen's Declaration, ECF No. 68 at ¶¶

2    36, 51, 55-58).  Fidelitad's theory is that Insitu purposefully ended its supplier

3    relationship with Fidelitad in order to cut Fidelitad out of the market that it had

4    developed and enabled Insitu to take advantage of that market to Fidelitad's

5    detriment.  ECF No. 64 at 26.

6         In response to one delay, on November 9, 2010, Mr. Edsall sent a letter to

7    Colonel Hans Palaoro, Chief of the U.S. Air Force Mission in Colombia.  ECF

8    Nos. 63-19; 64-4 at ¶82.  Among other things, the letter stated, "Boeing has now

9    decided to ignore signed contracts and withhold further shipments of ScanEagle

10   equipment to Colombia . . . placing soldiers on the ground at considerable risk.

11   When a vendor arbitrarily withholds critical capability, endangers soldiers on the

12   ground, and impugns the customer trust which is essential to our business,

13   Fidelitad will employ all means necessary to find alternative sources of

14   capability. . ."  ECF No. 63-19.  Three days later, Mr. Edsall sent an email to

15   Captain James Brown of PMA-263 stating that "Insitu intended to default on its

16   commitments to the USG, the COLAF and to Fidelitad."  ECF No. 63-20.  Then,

17   on December 8, 2010, Fidelitad sent a white paper to U.S. Senator Patty Murray

18   seeking her help and complaining that "Boeing legal intervened in the existing

19   business relationship between Fidelitad and Insitu and blocked delivery of

20   ScanEagle spare parts."  ECF No. 63-21.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT ~ 10

In February 2011, the parties met to discuss the status of their business relationship. ECF No. 64-4 at ¶ 107.  At the meeting, Mr. Edsall expressed his intent to continue to work with Insitu in Colombia and claimed he would take legal action to defend Fidelitad's rights if needed.  *Id.* at ¶¶ 109-10.  The next month, Insitu's CEO sent Mr. Edsall a letter informing him the parties' business relationship was terminated.  ECF No. 62-22.  The letter listed the reasons for the termination as, *inter alia*, Fidelitad's letters disparaging Insitu to third parties, concerns regarding Fidelitad's willingness to follow compliance processes, and that no distributorship agreement existed.  *Id.*

## DISCUSSION

**1. Motion to Exclude Declarations**

As a preliminary matter, Fidelitad moves to strike the declarations of Lt. Col. Charles Gerstenecker and Col. Michael Brown (ECF Nos. 62-23, 62-24) as a sanction pursuant to Federal Rule of Civil Procedure 37 for Insitu's alleged violation of discovery obligations.  ECF No. 75.  Specifically, Fidelitad contends (1) that Insitu did not identify either individual on its Rule 26 disclosures as potential witnesses, and (2) that Insitu had not provided Fidelitad either declaration until December 14, 2015, past the fact discovery deadline of September 18, 2015, per the Court's Second Amended Scheduling Order.  *Id.* at 2-3.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT ~ 11

The Court finds that Insitu complied with the discovery deadlines. Importantly, Fidelitad overlooks that Insitu filed an unopposed motion for a discovery extension on September 17, 2015. ECF No. 53. The motion requested to extend the discovery period for four government witnesses, including Lt. Col. Gerstenecker and Col. Brown. The Court granted this motion and extended discovery pertaining to these witnesses until February 4, 2016. ECF No. 55. Thus, Insitu provided Fidelitad these declarations within the discovery deadline.

Next, the Court finds Insitu's addition of these witnesses was made known to Fidelitad during the discovery process through timely supplementation. Fidelitad first received notice of these potential witnesses when Insitu filed its motion for a discovery extension on September 17, 2015, or at the very latest, when it received the two declarations on December 14, 2015, nearly two months prior to the close of discovery.[6] Such notice was sufficient. *See* Fed. R. Civ. P. 26(e)(1)(A).

---

[6] Moreover, it was Fidelitad who initially identified Lt. Col. Gerstenecker as its close collaborator in its Second Amended Complaint, ECF No. 37 at ¶ 161, and identified each individual in discovery responses as sources with key information. *See* ECF Nos. 62-1 at 4, 7; 62-2 at 9-10, 14.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 12

1    In its Reply, Fidelitad argues the Court's Order extending the discovery

2    deadline applied only to Insitu, and thus, it was unable to depose the witnesses

3    when it received their declarations.  ECF No. 85 at 2-3.  This argument is not

4    persuasive.  If Fidelitad wanted to depose these witnesses but believed it was

5    without court permission, it had ample time to move the Court for approval.  At

6    oral argument, Fidelitad disclaimed any interest in deposing these witnesses.

7    While the Court has "particularly wide" discretion when it comes to excluding

8    witnesses for discovery violations, the Court finds no violation here.  *See Ollier v.*

9    *Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 862 (9th Cir. 2014).  Because the

10   Court concludes that Insitu complied with Rule 26, Fidelitad's motion to strike Lt.

11   Col. Gerstenecker's and Col. Brown's declarations are denied.

12        Fidelitad also moved to quash the deposition notices for these two witnesses.

13   ECF No. 76.  Consequently, the depositions were not taken. In light of the Court's

14   ruling, this motion is denied as moot, subject to either party renewing the issue by

15   motion.

16   **2.  Motion for Summary Judgment**

17        Summary judgment may be granted to a moving party who demonstrates

18   "that there is no genuine dispute as to any material fact and the movant is entitled

19   to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the

20   initial burden of demonstrating the absence of any genuine issues of material fact.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT ~ 13

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to identify specific facts showing there is a genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.  Moreover, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp.*, 477 U.S. at 322.

For purposes of summary judgment, a fact is "material" if it might affect the outcome of the suit under the governing law. *Id.* at 248. A dispute concerning any such fact is "genuine" only where the evidence is such that the trier-of-fact could find in favor of the non-moving party. *Id.* "[A] party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* (internal quotation marks and alterations omitted). Moreover, "[c]onclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007); *see also Nelson v. Pima*

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT ~ 14

1    *Cmty. Coll.*, 83 F.3d 1075, 1081-82 (9th Cir. 1996) ("[M]ere allegation and

2    speculation do not create a factual dispute for purposes of summary judgment.").

3         In ruling upon a summary judgment motion, a court must construe the facts,

4    as well as all rational inferences therefrom, in the light most favorable to the non-

5    moving party, *Scott v. Harris*, 550 U.S. 372, 378 (2007), and only evidence which

6    would be admissible at trial may be considered, *Orr v. Bank of Am., NT & SA*, 285

7    F.3d 764, 773 (9th Cir. 2002); *see also Tolan v. Cotton*, 134 S.Ct. 1861, 1863

8    (2014) ("[I]n ruling on a motion for summary judgment, the evidence of the

9    nonmovant is to be believed, and all justifiable inferences are to be drawn in his

10   favor." (internal quotation marks and brackets omitted)).

11           **a. Misappropriation of Trade Secrets Claim**

12        First, Fidelitad contends that its "business plan, master plan, customer

13   development, and other information" constitute trade secrets. ECF No. 37 at ¶108;

14   *see also* ECF Nos. 62-2; 62-25. Fidelitad further contends that Insitu

15   misappropriated these trade secrets without Fidelitad's consent in violation of the

16   Washington Uniform Trade Secrets Act ("WUTSA"). ECF No. 37 at ¶¶ 106-121.

17        The WUTSA allows a plaintiff to recover monetary damages for the

18   misappropriation of trade secrets. RCW 19.108.030. It is the Plaintiff's burden to

19   establish the existence of a trade secret, that it was misappropriated, and that the

20   acquisition was done by improper means or through a person who owed a duty to

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT ~ 15

1    maintain the secrecy of the trade secret.  *Petters v. Williamson & Assocs., Inc.*, 151

2    Wash. App. 154, 164 (2009).

3        Accordingly, the Court must consider (1) whether there is an identifiable

4    trade secret at issue, (2) whether Defendants misappropriated or used the trade

5    secret, and (3) whether that misappropriation was done by improper means or in

6    breach of a duty.

7        The definition of a trade secret is a matter of law under the WUTSA and the

8    determination of whether specific information is a trade secret is a factual question.

9    *West v. Port of Olympia*, 146 Wash. App. 108, 192 (2008) (citation omitted).  The

10   WUTSA defines trade secret as:

11           information, including a formula, pattern, compilation, program,
             device, method, technique, or process that:
12
             (a) Derives independent economic value, actual or potential, from
13               not being generally known to, and not being readily
                 ascertainable by proper means by, other persons who can obtain
14               economic value from its disclosure or use; and

15           (b) Is the subject of efforts that are reasonable under the
                 circumstances to maintain its secrecy.
16

17   RCW 19.108.010(4); *see also Boeing Co. v. Sierracin Corp*., 108 Wash.2d 38, 49-50

18   (1987) (explaining trade secrets "must not be 'readily ascertainable by proper means'

19   from some other source").  "To be a trade secret, information must be 'novel' in the

20   sense that the information must not be readily ascertainable from another source."

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT ~ 16

*Spokane Research & Defense Fund v. City of Spokane*, 96 Wash. App. 568, 578 (1999); *see also Woo v. Fireman's Fund Ins. Co.,* 137 Wash. App. 480, 489 (2007) ("A trade secret must derive independent economic value from not being known to or generally ascertainable by others who can obtain economic value from their disclosure or use."). "The alleged unique, innovative, or novel information must be described with specificity and, therefore, 'conclusory' declarations that fail to 'provide concrete examples' are insufficient to support the existence of a trade secret." *Robbins, Geller, Rudman & Dowd LLP* v. State, 179 Wash. App. 711, 722 (2014) (quoting *McCallum v. Allstate Prop. and Cas. Ins. Co.,* 149 Wash. App. 412, 425-26 (2009)).

Here, Fidelitad's claimed trade secrets include 30 specified items with various sub-components. *See* ECF Nos. 62-2; 62-25. It contends its trade secrets involve a business plan, or "master plan," to establish direct commercial sales of ScanEagles with long-term support contracts in the Colombian market. *See* ECF No 62-25 at 6-9. The plan includes ideas to utilize ScanEagle systems for non-military uses, such as oil pipelines, counter-narcotics, and maritime surveillance. *Id.* at 10-32. The plan also incorporates ideas for various funding sources and is collectively referred to as UAS

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT ~ 17

Concepts of Operations ("CONOPS").[7]  *Id.*  Fidelitad presents these ideas and the combination of these ideas as trade secrets.  *Id.*

As explained below, the Court finds Fidelitad fails to meet its burden of establishing the existence of novel trade secrets that are not readily ascertainable from another source, and which were unknown to Mr. Edsall and Mr. Pita as Insitu employees, before they quit.  In other words, Insitu's former employees' collective knowledge of what they learned while working for Insitu cannot now form the basis of Fidelitad's trade secrets.  First, the evidence demonstrates that Insitu and other UAS suppliers were aware of the opportunities for UAS in Colombia, including opportunities for direct commercial sales with field support and non-military surveillance.  ScanEagles have been in Colombia since 2006. In fact, the evidence demonstrates that the early entry of ScanEagles into the Colombian market helped develop the later opportunity for direct commercial sales, and indicates that U.S. and Colombian markets were at least somewhat committed to ScanEagle systems before Fidelitad ever existed.  *See* ECF No. 62-24 at ¶¶ 4-6, 9 (Col. Brown's Declaration

---

[7] Fidelitad defines CONOPS as including ideas for proposed placement, coverage, and operation of ScanEagle hubs and spokes; numbers and types of ScanEagle UASs required; projected ScanEagle UAS flight hours; and additional ScanEagle UAS operational and logistic employment concepts.  ECF No. 62-25 at 4.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 18

1    explaining that in 2009, COLAF, in coordination with the U.S. Military, was looking

2    to purchase additional UAS platforms, and part of the reason COLAF ultimately

3    decided to purchase more ScanEagles was to maintain continuity and eliminate the

4    need to alternate between multiple systems.).  Further, ScanEagles were not the only

5    UAS platform being marketed in Colombia, *see* ECF No. 62-23 at ¶ 8 (Lt. Col.

6    Gerstenecker testifying that he "frequently received sales pitches from UAS

7    manufacturers interested in marketing their equipment for surveillance and other

8    missions in Colombia."), indicating other UAS manufacturers were cognizant of

9    potential business opportunities in the Colombian market.

10        Similarly, the evidence demonstrates that Fidelitad's ideas to utilize

11    ScanEagle systems for oil pipelines, counter-narcotics, and maritime surveillance

12    were not novel.  Utilizing the ScanEagle for such non-military uses was known by

13    Insitu well before Fidelitad was formed.  *See* ECF Nos. 63-3.  To the extent

14    Fidelitad was the first to plan to market and pursue direct sales of ScanEagle

15    systems for the above applications in Colombia, it fails to demonstrate that such

16    ideas were not known or readily ascertainable by others in the industry.

17        Next, Fidelitad fails to demonstrate that its ideas for funding sources were

18    not known or readily ascertainable.  For instance, Fidelitad proposed Ecopetrol, the

19    owner of the oil pipelines, as a source of funding for UAV pipeline surveillance.

20    ECF No. 62-25 at 10-12.  It is hardly novel to propose that the owner of a pipeline

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT ~ 19

may fund its security surveillance.  Further, while Fidelitad claims to have

knowledge of various military funding sources through its "unique

contacts/sources," ECF No. 62-24 at 10-14, Mr. Pita admitted to gaining these

contacts as an employee of Insitu.  *Compare* ECF No. 62-1 at 2-4 (Fidelitad's

response to interrogatories where it shares sources for the key information

underlying its trade secrets) *with* ECF No. 62-15 (the sources Mr. Pita made as an

Insitu employee as identified by him during his depositions).  Thus, to the extent

that such "unique contacts/sources" constitute trade secrets, the trade secrets

belong to Insitu.  *See Ed Nowogroski Ins., Inc. v. Rucker,* 137 Wash.2d 427, 437

(1999) (holding a former employee remains under a duty not to use or disclose

trade secrets acquired in the course of previous employment).

Moreover, the evidence demonstrates that Fidelitad's CONOPS location and

operational ideas were not novel, but rather originated with the U.S. and

Colombian militaries.  *See* ECF Nos. 62-24 at ¶¶ 7-14; 62-23 at ¶¶ 13, 15-18 (Lt.

Col. Gerstenecker and Col. Brown testifying that Col. Brown devised the plan to

build ScanEagle infrastructure in the La Macarena region and that Fidelitad and

other contractors may have provided limited technical input in developing the

CONOPS); s*ee also* ECF Nos. 62-23 at ¶¶ 23-25; 62-24 at ¶¶ 20-21 (Lt. Col.

Gerstenecker and Col. Brown testifying they reviewed Fidelitad's list of trade

secrets and did not consider any of the information to be secret or proprietary to

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT ~ 20

Fidelitad).  Fidelitad's argument that it expended time and research on these issues, ECF No. 64 at 5, is insufficient to establish that this resulted in unique, novel ideas. *See Woo*, 137 Wash. App. at 484 (explaining that the fact that plaintiff's insurance claim manuals "go into many pages of detail on the fine points of handling claims does not make them novel").  Mr. Pita's declaration in opposition to summary judgment does not create a genuine issue of fact on this subject.  ECF No. 64-5 (Mr. Pita claims ownership of the idea to locate ScanEagles at La Macarena: "I suggested changing the location . . . to La Macarena . . . in October 2010.").  To the contrary, an email forwarded by Mr. Pita in December 2009, while he was employed by Insitu, directly contradicts his seemingly sham declaration and explains that "Pedro Nunez brought up . . . La Macarena and it would be great to integrate the SCAN EAGLE at that location."  ECF No. 63-12.

In its briefing, Fidelitad sets forth several arguments in support that it held trade secrets.  First, it argues that its trade secrets consisted of "complex *compilations* of information," and was thus not readily ascertainable.  ECF No. 64 at 6.  However, it fails to provide concrete examples or describe with specificity such compilations.  *See Robbins*, 179 Wash. App. at 722.  Fidelitad also argues that the information it derived from its government sources qualifies for trade secret protection because it was not known or readily available by others within the UAS industry, ECF No. 64 at 6-7, but then fails to describe or provide evidence of the

specific information it received that was not readily available to other sources

seeking government contracts. *See Precision Moulding & Frame, Inc. v. Simpson

Door Co.*, 77 Wash. App. 20, 26 (1995) (holding that a source who would share

information with anyone coupled with the fact that the technology, albeit used for

other applications, had been available for more than 20 years means the

information was readily available).

Fidelitad repeatedly argues that Insitu fails to provide any evidence that the

"information at issue" was known by Insitu personnel or anyone within the UAS

industry.  See e.g., ECF No. 64 at 2-3.  However, even if true, it is Fidelitad, not

Insitu, who bears the burden of establishing the evidence to demonstrate the

existence of trade secrets.  *See Petters*, 151 Wash. App. at 164; *Celotex Corp.*, 477

U.S. at 322 (Summary judgment is mandated "against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial.")

Based on the foregoing analysis and authority, the Court concludes that

Fidelitad has not met its burden of establishing a genuine factual issue concerning

the existence of any trade secrets in order to defeat Defendant's summary

judgment motion.  Accordingly, Insitu's motion for summary judgment on

Fidelitad's WUTSA claim is **GRANTED**.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT ~ 22

### b.  Non-WUTSA Contract Claims

#### i.  Breach of Proprietary Information Agreement Claim

Fidelitad argues that through the misappropriation of its trade secrets Insitu breached the parties' PIA contract.[8]  ECF No. 37 at ¶¶ 122-132.

To prevail on a breach of contract claim under Washington law, a plaintiff must show (1) the existence of a valid contract; (2) breach of a duty imposed by that contract; and (3) damages resulting from the breach. *Nw. Indep. Forest Mfrs. v. Dep't of Labor & Indus.,* 78 Wash. App. 707, 712 (1995).

Insitu argues there is an absence of evidence to demonstrate that it misappropriated any of Fidelitad's proprietary information.  ECF No. 59 at 25.  In support, it argues it could not breach the PIA by relying upon information it already knew, could ascertain from public sources, or was told by government officials.  *Id.*  According to the PIA, excluded from protection is information which "(i) is now or hereafter enters the public domain without any violation of this Agreement; (ii) was known to the receiving party prior to the time of disclosure by

---

[8] Insitu argues Fidelitad's remaining non-WUTSA claims are preempted by the WUTSA but acknowledges the statute preserves contractual liability.  ECF No. 59 at 25 (citing RCW 19.108.900(2)(a)).

1  the disclosing party; or (iii) was disclosed in good faith to the receiving party by a

2  third party legally entitled to disclose the same." ECF Nos. 37-4 at 1, 65-11 at 2.

3       Relying solely on its trade secrets argument, Fidelitad first claims there is

4  "considerable evidence that Insitu did not [previously] know the information at

5  issue and that the information was not readily ascertainable."  ECF No. 64 at 12.

6  Further, Fidelitad notes that the definition of "Proprietary Information" in the PIA

7  is broader than the definition of a "trade secret" under Washington law.  *Id*.  But

8  here, Fidelitad does not identify any proprietary information beyond those thirty

9  items it also claims to be trade secrets.  ECF No. 64-2 at 85 ("Fidelitad's claim[] . .

10  . for breach of the PIA . . . implicate thirty different trade secrets").  As discussed

11  above, Fidelitad has failed to establish a single trade secret and thus, necessarily

12  has failed to establish any protected proprietary information.

13       Next, Fidelitad contends there is ample evidence showing that Insitu did in

14  fact use Fidelitad's proprietary information," citing its statement of facts 150-69

15  (ECF No. 64-2).  ECF No. 64 at 12.  Yet, Fidelitad presents no evidence that Insitu

16  used any of this information improperly.  Fidelitad points to the subsequent sales

17  of ScanEagles to customers, but fails to show how any of its proprietary

18  information was used by Insitu.  The Court is merely left to speculate and that does

19  not create a genuine issue of material fact sufficient to defeat summary judgment.

20

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT ~ 24

1    Finally, Fidelitad contends it has "presented considerable evidence" that the

2  U.S. Government disclosed proprietary information to Insitu, citing to its statement

3  of facts 150-69 (ECF No. 64-2) and PODF 42, 76 (ECF No. 64-1).  ECF No. 64 at

4  13.  Again, merely because the military customers placed orders for goods from

5  Insitu, even if those goods were to the specifications the military developed with

6  Fidelitad assistance, does not itself establish Insitu's breach of the proprietary

7  information agreement.  See *Celotex Corp.*, 477 U.S. at 322 (Summary judgment is

8  mandated "against a party who fails to make a showing sufficient to establish the

9  existence of an element essential to that party's case, and on which that party will

10  bear the burden of proof at trial.")

11    Accordingly, Insitu's motion for summary judgment on the breach of the

12  PIA claim is **GRANTED**.

13    **ii.  Breach of Implied Duty of Good Faith and Fair Dealing**

14    **Claim under the PIA**

15    Insitu argues there is an absence of evidence to demonstrate that it

16  misappropriated any of Fidelitad's proprietary information and as a logical

17  consequence, Fidelitad's claim for breach of the implied duty of good faith and fair

18  dealing fails.  ECF No. 59 at 24.  Fidelitad does not address its claim for breach of

19  the implied duty of good faith and fair dealing as it relates to the PIA.  See ECF

20  No. 64.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT ~ 25

In Washington, every contract carries with it an implied covenant of good faith and fair dealing that obligates the parties to cooperate with one another so that each may obtain the full benefit of performance. *Frank Coluccio Constr. Co., Inc. v. King Cnty.*, 136 Wash. App. 751, 764 (2007) (citation omitted).

Here, Fidelitad has provided no argument and established no facts sufficient to defeat summary judgment. In fact, Fidelitad does not address this claim in its response to the motion for summary judgment. The duty of good faith and fair dealing is inextricably intertwined with the explicit duties under the PIA contract, about which there are no genuine disputed issues of material fact, as discussed above. Accordingly, Insitu's motion for summary judgment on the issue of breach of the duty of good faith and fair dealing under the PIA is **GRANTED**.

### c. Remaining Non-WUTSA Claims

Insitu argues Fidelitad's remaining claims are either preempted by the WUTSA or fail due to a lack of evidence of misappropriation. ECF No. 59 at 24.

The WUTSA "displaces conflicting tort, restitutionary, and other law of this state pertaining to civil liability for misappropriation of a trade secret." RCW 19.108.900(1). In evaluating whether a cause of action is preempted under the WUTSA, courts

> (1) assess the facts that support the plaintiff's civil claim; (2) ask whether those facts are the same as those that support the plaintiff's UTSA claim; and (3) hold that the UTSA preempts liability on the civil claim unless the common law claim is factually independent

1  from the UTSA claim.

2  *Thola v. Henschell,* 140 Wash. App. 70, 82 (2007).

3      The difference between Fidelitad's WUTSA claim and its remaining tort

4  claims is the misappropriation of a trade secret.  Fidelitad "may not rely on acts

5  that constitute trade secret misappropriation" to support these claims.  *Thola*, 140

6  Wash. App. at 82.  On the other hand, where evidence establishing an unjust

7  enrichment or tortious interference claim "does not involve the acquisition or

8  disclosure of confidential information" in a manner that would establish a WUTSA

9  claim, these claims are not preempted.  *Id.* at 83.  Accordingly, to avoid

10  preemption on the claims below, Fidelitad is limited to facts outside of the alleged

11  misappropriation claim.

12          **i.  Unjust Enrichment Claim**

13      Under Washington law unjust enrichment occurs "where money or property

14  has been placed in a party's possession such that in equity and good conscience the

15  party should not retain it." *Lynch v. Deaconess Med. Ctr.,* 113 Wash.2d 162, 166

16  (1989) (citations omitted).  To demonstrate unjust enrichment, Fidelitad must show

17  that "(1) the defendant receive[d] a benefit, (2) the received benefit is at the

18  plaintiff's expense, and (3) the circumstances make it unjust for the defendant to

19  retain the benefit without payment." *Young v. Young*, 164 Wash.2d 477, 484-85

20  (2008); *see Bailie Commc'ns, Ltd. v. Trend Bus. Sys., Inc.*, 61 Wash. App. 151, 160

1   (1991) ("Unjust enrichment occurs when one retains money or benefits which in

2   justice and equity belong to another.") (citation omitted).

3        Fidelitad claims all three elements are satisfied.  In support, it argues (1)

4   Insitu's sales revenue in Colombia "skyrocketed" due to Fidelitad's efforts, (2)

5   Fidelitad did not share this revenue, and (3) such circumstances are unjust because

6   Insitu induced Fidelitad to undertake its efforts by promising it would benefit from

7   an exclusive distributor arrangement in Colombia.  ECF No. 64 at 16-17.

8   "Enrichment alone will not suffice to invoke the remedial powers of a court of

9   equity.  It is critical that the enrichment be unjust both under the circumstances and

10  as between the two parties to the transaction."  *Norcon Builders, LLC v. GMP*

11  *Homes VG, LLC*, 161 Wash. App. 474, 490 (2011) (citation omitted).

12       Viewing the evidence in the light most favorable to Fidelitad, the Court finds

13  there is a genuine dispute as to whether Insitu was unjustly enriched.  The

14  submitted evidence demonstrates that Insitu received the substantial benefit of

15  increased revenues immediately following Fidelitad's efforts to develop the

16  Colombian market.  *See* ECF No. 69-1 at 6-9 (Insitu's year-by-year revenues from

17  the Colombian UAS market).  Moreover, the Court may infer from the submitted

18  evidence that Fidelitad undertook these marketing efforts if not on a promise, at

19  least with an expectation of reaching a distributor agreement (potentially a value

20

added reseller agreement) for the Colombian market, *see* ECF Nos. 65-7; 69-6, thereby suggesting unjust or inequitable circumstances.

In its motion, Insitu contends Fidelitad "may have benefited Insitu by promoting Insitu's products and services, but that is not unjust enrichment." ECF No. 59 at 26. Insitu analogizes that when a Sports Authority circular advertises Nike sneakers, it may lead a consumer to buy those sneakers, but buying them from a Nike store does not unjustly enrich Nike. *See id.* What Insitu is arguing is that a mere volunteer cannot seek damages for unjust enrichment. *See Young*, 164 Wash.2d at 484 (citation omitted). But here, Fidelitad is not a mere volunteer, it had an ill-defined relationship with Insitu for which the jury will have to decide whether it is deserving of equitable compensation.

Because Fidelitad has submitted sufficient specific facts, if found by a jury to exist, could support the elements of its unjust enrichment claim, Insitu's motion for summary judgment on this claim is **DENIED**.

### ii. Tortious Interference with Business Expectancy Claim

To prevail on its tortious interference claim, Fidelitad must show (1) the existence of a valid contractual relationship or business expectancy; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) that defendants interfered for an improper purpose or used improper means; and

(5) resultant damages.  *Commodore v. Univ. Mech. Contractors, Inc.*, 120 Wash.2d 120, 137 (1992) (citation omitted).  Intentional interference "denotes purposefully improper interference."  *Birkenwald Distrib. Co. v. Heublein, Inc.*, 55 Wash. App. 1, 11 (1989) ("When one acts to promote lawful economic interests, *bad motive* is essential, and incidental interference will not suffice.") (citations omitted; emphasis added).

The gravamen of Fidelitad's tortious interference claim rests on Insitu's termination of the parties' business relationship. Specifically, Fidelitad argues Insitu interfered with its business expectancies through

> (i) its refusal to fulfill orders with Fidelitad's customers, (ii) its failure to act in good faith with respect to the RBAM process and export compliance issues, (iii) its desire to step in and exclude Fidelitad from the market that Fidelitad had spent nearly a year creating and developing, and (iv) its failure to honor its commitments that Fidelitad would act as a Value Added Reseller and serve as its "exclusive distributor" in Colombia.

ECF No. 64 at 14.

The Court finds that Fidelitad has failed to present specific evidence to demonstrate Insitu acted in bad faith or with improper motive. *See Birkenwald*, 55 Wash. App. at 11.  To support its argument of improper motive, Fidelitad primarily relies on testimony from a former Insitu employee, Brenda Jensen, *see* ECF No. 64 at 26, who now works for Fidelitad.  However, the relied upon testimony simply indicates Insitu subjected Fidelitad to strict export compliance processes, ECF No.

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ~ 30

68 at ¶ 36, which a Boeing lawyer struggled to implement due to inexperience, *id.* at ¶ 51.  Ms. Jensen's belief that the inexperienced lawyer was assigned the case for malicious reasons, *id.* at ¶ 52, is insufficient to demonstrate improper motive as her statement is pure speculation.  Moreover, the same Ms. Jensen acknowledged in her deposition that she had no personal knowledge that anyone at Insitu attempted to injure or harm Fidelitad.  *See* ECF No. 62-6 at 21.  Ms. Jensen was Insitu's Designated Empowered Official (DEO) and as such had the power to submit export documentation with the State Department.  *Id*. at 19.  Ms. Jensen tried to adhere to export control requirements, took positions on export control requirements in good faith, didn't make up export control issues where none existed, did not make up export control issues in order to delay fulfillment of orders, and did not take any actions with the intent to harm Fidelitad's business. *Id*. at 18-20.  Moreover, Mr. Edsall candidly admitted in his deposition that he had no evidence that Insitu's application of the RBAM to Fidelitad's transaction were done in bad faith. ECF No. 62-5 at 241.

The Court has thoroughly and cautiously examined the deposition testimony of Ms. Jensen, ECF No. 62-6, and her subsequent Declaration, ECF No. 68.  This Court finds Ms. Jensen's Declaration to be a sham; it was drafted in such a way to clearly and unambiguously contradict her prior deposition testimony where she previously disclaimed any improper purpose or motive on behalf of Insitu.  *See*

*Van Asdale v. Int'l Game Tech*., 577 F.3d 989, 998-99 (9th Cir. 2009).

Accordingly, the Court rejects Ms. Jensen's newly acquired "belief" about Insitu's

ulterior motives.

Summary judgment is mandated "against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*,

477 U.S. at 322.  At this stage of the proceeding, pure speculation is not enough.

Because Fidelitad cannot establish bad faith or improper motive, Insitu's

motion for summary judgment on the tortious interference claim is **GRANTED**.

### d.  Insitu's Breach of Contract Counterclaim

Finally, Insitu moves for summary judgment on its contract counterclaim.

To prevail on a breach of contract claim under Washington law, a party must

demonstrate (1) the existence of a valid contract; (2) breach of a duty imposed by

that contract; and (3) damages resulting from the breach.  *Nw. Indep. Forest Mfrs.*,

78 Wash. App. at 712.

Insitu argues that Fidelitad breached the terms of a purchase order for

ScanEagle Training.  Insitu alleges Fidelitad requested and Insitu provided

ScanEagle training for a Fidelitad employee in the fall of 2010.  ECF No. 59 at 30.

Insitu claims this training cost $27,000, Fidelitad agreed to pay this price, and

subsequently, Fidelitad breached the parties' contract by refusing to pay.  *Id.*

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT ~ 32

1    Fidelitad counters that its obligation to pay Insitu $27,000 for training was

2    discharged by the doctrine of frustration.  ECF No. 64 at 29-30.  Fidelitad argues

3    both parties understood the purpose of enrolling the employee in the training was

4    to enable him to fill a field service position in Colombia, and that this purpose was

5    frustrated when the parties' business relationship ended.  *Id.*

6    In support, Fidelitad cites to *Wash. State Hop Producers, Inc. Liquidation*

7    *Trust v. Goschie Farms, Inc.*, which states the doctrine of frustration is

8    > Where, after a contract is made, a party's principal purpose is
      > substantially frustrated without his fault by the occurrence of an event

9    > the non-occurrence of which was a basic assumption on which the
      > contract was made, his remaining duties to render performance are

10   > discharged, unless the language or the circumstances indicate the
     > contrary.

11

12   112 Wash.2d 694, 700 (1989) (citing Restatement (Second) of Contracts § 265

13   (1979)).

14   Here, Fidelitad has not adequately demonstrated frustration. The Court is not

15   persuaded that Fidelitad would be unable to benefit from the employee's training.

16   While its undefined role as an Insitu distributor ended, there is no evidence

17   suggesting Fidelitad is prevented from selling its ScanEagle field support services,

18   and thereby utilize its employee's training.  Thus, the doctrine of frustration

19   defense does not defeat this claim.  *See id.* at 704 (explaining contract "[r]ecission

20   based upon slight frustration would be inappropriate").

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT ~ 33

Further, the evidence demonstrates Insitu contracted with Fidelitad to provide an employee ScanEagle operator training at the price of $27,000, ECF No. 63-17 (purchase order for training); *see id.* at 2 ¶¶ 1, 6 (integration and risk of loss clauses), and that Mr. Pita admitted a Fidelitad employee was trained and that Fidelitad refused to pay for the training upon dissolution of the parties' business relationship. ECF No. 62-4 at 6. Accordingly, because there is no genuine dispute over a material fact, Insitu's motion for summary judgment on its counterclaim is **GRANTED**.

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1. Defendant's Motion for Summary Judgment (ECF No. 59) is **DENIED IN PART and GRANTED IN PART** as outlined above.

2. Plaintiff's Motion to Strike Declarations (ECF No. 75) is **DENIED.**

3. Plaintiff's Motion to Quash Deposition Notices (ECF No. 76) is **DENIED** as moot.

The District Court Executive is hereby directed to enter this Order and provide copies to counsel.

**DATED** April 21, 2016.



THOMAS O. RICE
Chief United States District Judge

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT ~ 34